**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF VERMONT**

UNITED STATES OF AMERICA          :
ex rel. ROBERT HARRIS,            :
      Plaintiff,                  :
                           :
      v.                          :          No. 2:05-CV-212
                           :
EPS, INC., FRED HUTCHINS, and     :
RICK FLETCHER,                    :
      Defendants.                   :

<u>**OPINION AND ORDER**</u>

In this suit under the False Claims Act ("FCA"), Relator Robert Harris alleges that he was terminated in retaliation for discovering and complaining about fraudulent conduct on the part of his fellow employees at EPS, Inc.  Following dismissal of one count of the Complaint, the United States is no longer a party to the action.  The remaining count alleges violations of the FCA's whistleblower provisions and Vermont public policy by EPS; its owner, Fred Hutchins; and its manager, Rick Fletcher.  The Defendants have filed a motion to dismiss or to stay (Doc. 18; the "arbitration motion") on the ground that the dispute must be submitted to arbitration.  Hutchins and Fletcher have also filed a separate motion to dismiss (Doc. 28; the "Hutchins/Fletcher motion") arguing that they cannot be sued in their individual capacities.  For the reasons set forth below, the arbitration motion is DENIED, and Hutchins/Fletcher motion is GRANTED.

BACKGROUND

**A.    The employee handbook and acknowledgment form**

EPS is a Vermont corporation which provides compliance
review services for federal rental subsidy programs. When Harris
began working at EPS in early 2003, he was presented with an
"Employee Handbook."  See Ex. to Pl.'s Statement of
Uncontroverted Material Facts (Doc. 33) (the "Handbook").  The
Handbook contained 19 numbered pages.  The first page contained a
notice stating that "EPS reserves the right to change, revise,
eliminate or add to any of the policies and/or benefits described
in this Handbook, at its discretion, at any time." Id. at 1.  It
also contained a disclaimer which stated: "This Handbook does not
constitute an employment contract and is not intended to create
contractual obligations of any kind." Id.  The Handbook went on
to describe EPS's compensation and leave policies, workplace
expectations, confidentiality requirements, nondiscrimination and
sexual harassment policies, and other employment policies.

Under a heading entitled "Complaint Resolution Procedure,"
the Handbook stated, "[a]ll legal grievances against the company
must be submitted to compulsory arbitration.  For more
information, see the Employee Acknowledgment Form." Id. at 19.
It also stated that "[a]ll employees must sign an Employee
Acknowledgment Form indicating their receipt of this employment
Handbook; . . . and their agreement that all legal grievances

2

against the company must be submitted to compulsory arbitration."
Id.

Along with the numbered pages of the Handbook, Harris received and was asked to sign two unnumbered pages entitled "Employee Acknowledgment Form."  See id. (unnumbered pages appended to Handbook) (the "Acknowledgment Form" or "Form").  The Form stated, "I acknowledge that I have received a copy of this employment Handbook" and "[t]he employee Handbook contains important information about employment at EPS, Inc., and about employee rights and responsibilities."  Further down, it stated, "I acknowledge that this Handbook is neither a contract of employment nor a legal document."  The Form also contained the following text:

> I also agree, except as otherwise limited herein, that any and all employment-related legal disputes, controversies or claims I may have arising out of, or relating to, my application or candidacy for employment, my employment or cessation of employment with EPS, shall be settled exclusively by final and binding arbitration before a neutral, third-party Arbitrator.  EPS and I shall participate equally in the selection of an Arbitrator to decide the arbitration.  Arbitration shall apply to any and all disputes, controversies, or claims I may have, whether asserted against EPS and/or against any employee, officer, alleged agent, director, or affiliate company.
>
> I agree that all previously unasserted claims I may have arising under federal, state or local statutory or common law shall be subject to arbitration.  I agree that the claims subject to arbitration include, but are not limited to, claims arising under the Age Discrimination in Employment Act (ADEA), Title VII of the Civil Rights Act of 1964, as amended, including the amendments of the Civil Rights Act of 1991, the Americans with Disabilities Act (ADA), the Fair Labor Standards Act (FLSA), 42 U.S.C. §

3

> 1981, as amended, including the amendments of the Civil
> Rights Act of 1991, the Employee Polygraph Protection Act,
> the Employment Retirement Income Security Act (ERISA),
> Vermont Fair Employment Practices Act (FEPA), other state
> discrimination statutes, state statues and/or common law
> claims regulating employment termination, the law of
> contract or the law of tort; including, but not limited
> to, claims for malicious prosecution, wrongful discharge,
> wrongful arrest/wrongful imprisonment, intentional/
> negligent infliction of emotional distress or defamation.
>
> . . .
>
> This arbitration provision may affect your legal rights.
> You may wish to seek legal advice before signing the
> Employee Acknowledgment Form.

Id.  Harris signed and returned a copy of the Form.  See Ex. A to

Mot. to Dismiss (Doc. 18).

**B.   Harris's alleged discovery of fraud and his subsequent
       termination**

     For present purposes, the facts asserted in the Complaint

are presumed to be true.  In early 2004, Harris was responsible

for coordinating EPS's services relating to the Department of

Housing and Urban Development ("HUD") Section 236 subsidy

program.  Under a contract with the state of Michigan, EPS

provided compliance review services for that state's Section 236

program.  In this role, EPS was responsible for verifying that

subsidized properties had supplied certain HUD-required

certifications.

     In January 2004, Harris learned that certain EPS employees

were signing and submitting to a HUD database worksheets which

stated that verifications had been performed when in fact they

4

had not.  He informed Hutchins and Fletcher, both of whom
initially appeared to take his concerns seriously.  Both men
indicated in subsequent company communications that they were
concerned about the behavior that Harris had identified.  On
February 6, Harris received a positive performance evaluation
from Fletcher that included comments commending him for bringing
these issues to the company's attention.

Subsequently, Harris began to believe that his allegations
of fraud were not being taken seriously.  On March 19, 2004, he
emailed Fletcher about another problem with an employee who was
falsely stating that certain supporting documentation was on
file.  On March 24, he asked to be relieved of his responsibility
over the Section 236 area, because he felt that his concerns were
not being addressed.  That same day, EPS terminated Harris,
alleging that he had been insubordinate to a supervisor, that he
had raised his voice, and that he had asked to be fired.  Shortly
thereafter, Harris filed complaints with HUD about EPS's failure
to conduct its verification duties properly.

## C.  **Procedural history**

In May 2004, Harris brought this suit against EPS, Hutchins,
and Fletcher.  The Complaint contained two counts.  Count I,
which was brought on behalf of the United States under the FCA,
31 U.S.C. § 3729, alleged that Defendants had made false claims
by seeking payment for verification services that had not been

5

performed.  Count II alleged that Defendants had violated the whistleblower provisions of the FCA, 31 U.S.C. § 3730(h), as well as Vermont public policy, by taking adverse employment actions against him.

Subsequently, Harris and the United States agreed to dismiss Count I, the false claims count.  On July 29, 2005, a stipulated notice of dismissal with prejudice was entered as to Count I; as a result, the United States is no longer a party.  The Defendants then filed motions to dismiss the remaining count, Count II.  Now before the Court are the arbitration motion, which was filed on November 17, 2005, and the Hutchins/Fletcher motion, which was filed on January 10, 2006.

**DISCUSSION**

**I. THE ARBITRATION MOTION**

Defendants seek to dismiss the case pursuant to Fed. R. Civ. P. 12(b)(6), or, in the alternative, to stay the case pending arbitration.  They argue that Harris is precluded from bringing an action in this Court by virtue of the arbitration clause contained in the Acknowledgment Form.

Harris has filed two memoranda opposing the motion.  In his first opposition, he argues that the motion raises matters outside of the pleadings and that it should be denied for failing to comply with the rules governing motions for summary judgment. In his second memorandum, styled a "substantive opposition," he

argues that there is no contract to arbitrate because the arbitration clause on which Defendants rely is part of the Handbook, which explicitly states that it does not form a contract.  In the alternative, Harris argues that the arbitration clause is invalid to the extent that it requires him to pay for the arbitration or limits his rights of discovery.  In light of the Court's determination that there was no agreement to arbitrate, it is unnecessary to reach Harris's alternative arguments.

**A.   <u>Proper procedural treatment of Defendants' motion</u>**

The parties' first disagreement concerns whether Defendants' motion should be treated as a motion to dismiss or a motion for summary judgment.  Harris takes the latter view on the ground that Defendants have raised matters outside of the pleadings. Defendants argue that their motion is properly labeled a motion to dismiss because it does not address the merits of Harris's action.

Despite Defendants' invocation of Fed. R. Civ. P. 12(b)(6), Harris is correct that the Court must apply the summary judgment standard to their claim that the dispute is subject to arbitration.  "[T]he summary judgment standard is appropriate in cases where the District Court is required to determine arbitrability," regardless of how the party that favors arbitration styles its motion.  <u>Bensadoun v. Jobe-Riat</u>, 316 F.3d

171, 175 (2d Cir. 2003); see also Santos v. GE Capital 397 F.
Supp. 2d 350, 353 (D. Conn. 2005) ("When a motion to dismiss is
premised upon a request to compel arbitration, . . . the Court
'applies a standard similar to that applicable for a motion for
summary judgment.'") (quoting Bensadoun, 316 F.3d at 175).
Accordingly, with respect to the question of arbitrability,
Defendants must "show that there is no genuine issue as to any
material fact and that [they are] entitled to a judgment as a
matter of law."  Fed. R. Civ. P. 56(c).

     Harris goes on to suggest that Defendants' motion should be
denied because insufficient discovery has taken place and because
Defendants have not complied with the requirements of Fed. R.
Civ. P. 56 and Local Rule 7.1(c), which govern summary judgment
motions.  However, given that EPS has now disclosed the entire
contents of the Handbook and the Acknowledgment Form, there has
been sufficient factual development to determine whether the
parties agreed to arbitrate.  See, e.g., Stamford Holding Co. v.
Clark, No. 3:02CV1236, 2003 WL 1597206, *6 n.7 (D. Conn. 2003)
("In any event, [the party seeking to avoid arbitration] has been
given an opportunity to develop a factual record here.").  Harris
has conceded as much by filing a "substantive opposition"
addressing the merits of Defendants' motion.  Accordingly, the
Court proceeds to the substantive issues raised by the
arbitration motion.

B.   **Whether the parties agreed to arbitrate**

Defendants argue that by signing the Acknowledgment Form, Harris entered into a binding agreement to arbitrate any disputes arising out of his employment.  In general, the law permits an employer and its employee to enter into a contract stipulating that statutory or common-law claims arising out of the employment relationship must be submitted to arbitration.  See, e.g., Gold v. Deutsche Aktiengesellschaft, 365 F.3d 144, 147-48 (2d Cir. 2004) (holding that employee's Title VII employment discrimination claims were subject to mandatory arbitration). The first step in determining whether a dispute must be sent to arbitration is to decide "whether the parties agreed to arbitrate[.]"  JLM Industries, Inc. v. Stolt-Nielsen SA, 387 F.3d 163, 169 (2d Cir. 2004); see also Security Ins. Co. of Hartford v. TIG Ins. Co., 360 F.3d 322, 325 (2d Cir. 2004) ("[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.").  In making this determination, courts "should apply ordinary state-law principles that govern the formation of contracts."  First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995).

Harris argues that EPS cannot establish that the parties agreed to arbitrate.  His argument proceeds in two parts: (1) the Acknowledgment Form, which contains the purported arbitration clause, is part of the Handbook; and (2) nothing in the Form or

any other part of the Handbook can be considered to form a
binding agreement in light of the disclaimers stating that the
Handbook does not form a contract or create contractual
obligations.

With regard to the first issue, the Form sends mixed signals
as to whether it was intended to be part of the Handbook.  In
three locations, the Form contains references to "*this* employment
Handbook" and "*this* Handbook" (emphasis added), suggesting that
the parties did view it as part of the Handbook.  In four other
locations, the Form refers to "*the* employee Handbook" and "*the*
Handbook" (emphasis added), suggesting that it should be
considered a separate document.

There is a well-established rule in Vermont, as elsewhere,
that ambiguous terms of a document must be construed against the
drafter.  <u>State v. Spitsyn</u>, 174 Vt. 545, 547, 811 A.2d 201, 204
(2002).  Applying this rule, the Court concludes that the Form is
part of the Handbook.  EPS, as the drafter of the Form, could
have clearly specified that it and the Handbook were two
independent documents.  By not doing so, EPS ran the risk that
Harris would interpret the references to "this Handbook" to mean
that the Form was part of the Handbook.

It follows that the disclaimers indicating that the Handbook
is not a contract must be applied to the Form as well.  The
Handbook clearly states: "This Handbook does not constitute an

10

employment contract and is not intended to create contractual obligations of any kind."  Similarly, the Form itself states that "this Handbook is neither a contract of employment nor a legal document."  EPS further underscored the noncontractual nature of the Handbook by reserving "the right to change, revise, eliminate or add to any of the policies and/or benefits described in this Handbook, at its discretion, at any time."  Having inserted these disclaimers in an apparent effort to avoid vesting Harris with contractual *rights*, EPS cannot conveniently choose to ignore them and argue that the Handbook imposed contractual *obligations* on Harris.

To be sure, the Form does contain some features, such as the use of the words, "I agree," and the space for the employee's signature, that, when viewed in isolation, could be interpreted as giving rise to contractual obligations.  Elsewhere, however, the language is more equivocal, as where it states, "[t]his arbitration provision *may* affect your legal rights" (emphasis added).  Viewed in context, the use of language such as "I agree" cannot overcome the express disclaimers stating that the Handbook does not create contractual obligations.  At most, the evidence of intent to form a contract is ambiguous, and once again, EPS's argument is unavailing in light of the rule of construction against the drafter.

There is ample authority for the notion that where an

employer uses disclaimers indicating that it does not intend to be bound by the policies in an employee handbook, the employer cannot enforce a policy of mandatory arbitration, even if the employee has signed an acknowledgment form.  See, e.g., Gibson v. Neighborhood Health Clinics, Inc., 121 F.3d 1126, 1131-32 (7th Cir. 1997) (holding that arbitration clause in employee manual was not enforceable where the manual included a disclaimer stating that it was not a contract and that the employer could modify or terminate its terms at any time); Heurtebise v. Reliable Bus. Computers, Inc., 550 N.W.2d 243, 247 (Mich. 1996) (holding that no enforceable arbitration agreement was created when employer included disclaimer that "the Policies specified herein do not create any employment or personal contract, express or implied"); see also Dumais v. Am. Golf Corp., 299 F.3d 1216, 1220 (10th Cir. 2002) (arbitration agreement was illusory and therefore unenforceable because it was subject to unilateral alteration by the employer).

    At least one court has reached a contrary conclusion in a case presenting similar facts to this one.  See Patterson v. Tenet Health Care, Inc., 113 F.3d 832 (8th Cir. 1997).  Applying Missouri law, the Patterson court found that an arbitration clause in an acknowledgment form constituted a valid agreement to arbitrate, even though the employee handbook stated elsewhere that it was not intended to form a contract.  Id. at 835.  The

12

court noted that the arbitration clause was designed to be removed from the handbook, and that it presented a "marked transition in language and tone" from the rest of the handbook, using terms such as "I agree" and "I understand." Id. These factors, according to the court, "would sufficiently impart to an employee that the arbitration clause stands alone, separate and distinct from the rest of the handbook." Id.

The Court finds the reasoning of cases such as Gibson and Heurtebise to be more persuasive than that of Patterson. It is difficult to conclude that relatively subtle factors such as a transition in language and tone could overcome explicit statements that the handbook does not form a contract and does not create contractual obligations. Moreover, the Patterson court does not appear to have considered whether the arbitration agreement in question was illusory. If the employer reserves the right to change the terms of the handbook at any time, it is irrelevant whether the employee is aware that the acknowledgment form is intended to be a contract. See Dumais, 299 F.3d at 1220.

Accordingly, the Court holds that the Form did not constitute a binding agreement to arbitrate. Applying the summary judgment standard, the Court denies Defendants' motion on the ground that they have not demonstrated that they are entitled to arbitration as a matter of law.

13

## II. <u>THE HUTCHINS/FLETCHER MOTION</u>

Hutchins and Fletcher have filed a motion to dismiss on the ground that they have no individual liability under the FCA's retaliation provisions or Vermont common law.  They also seek attorneys' fees on the ground that Harris's claims against them are frivolous.

### A.   <u>Standard of review</u>

When deciding a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true." <u>Todd v. Exxon Corp.</u>, 275 F.3d 191, 197-98 (2d Cir. 2001).  A district court may grant a motion to dismiss for failure to state a claim only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." <u>Id.</u> at 198. Therefore, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." <u>Id.</u>

### B.   <u>Whether individual liability is available under the FCA</u>

The Complaint alleges that the Defendants are liable to Fletcher under 31 U.S.C. § 3730(h), which provides:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in

14

furtherance of an action under this section, including
investigation for, initiation of, testimony for, or
assistance in an action filed or to be filed under this
section, shall be entitled to all relief necessary to make
the employee whole.

31 U.S.C. § 3730(h) (emphasis added).  As Hutchins and Fletcher

point out, however, numerous courts have interpreted this

statute's use of the words "by his or her employer" to mean that

an employee may bring an action under this subsection only

against the corporation or entity that employs him or her, not

against a supervisor or other individual.  See, e.g., United

States ex rel. Golden v. Arkansas Game & Fish Comm'n, 333 F.3d

867, 870-71 (8th Cir. 2003) (holding that members of state

commission were not "employers" of commission employee for

purposes of FCA retaliation claim); United States ex rel. Siewick

v. Jamieson Sci. and Eng'g, Inc., 322 F.3d 738, 740 (D.C. Cir.

2003) ("The corporation only is the employer of the corporation's

employees."); United States ex rel. Lamar v. Burke, 894 F. Supp.

1345 (E.D. Mo. 1995) (holding that company president was not

"employer" under the FCA).  In this Court, Magistrate Judge

Niedermeier has reached a similar conclusion.  See Magistrate

Judge's Report and Recommendation, Brown v. City of S.

Burlington, No. 1:01-cv-00318-jgm, at 12-13 (Apr. 7, 2003) (not

adopted on other grounds) (recommending dismissal of FCA claims

against supervisors in their individual capacities).

Harris's position, by contrast, has little or no support in

the case law.  One district court has held open the possibility
that a board member might qualify as a "de facto employer" where
she "dominated and dictated the actions" of the corporation that
employed the plaintiff.  <u>Mruz v. Caring, Inc.</u>, 991 F. Supp. 701,
710 (D.N.J. 1998).  Other courts have rejected this notion,
however.  <u>See, e.g.</u>, <u>Siewick</u>, 322 F.3d at 740 ("The principle
[that an individual does not qualify as an 'employer'] applies
with no less force when an individual has a significant ownership
interest in the corporation and substantially controls its
actions.").  In any event, the Complaint in this case makes no
suggestion that Hutchins or Fletcher dominated or dictated EPS's
actions.

Harris urges the Court to adopt the more expansive "economic
realities" test that is used to determine whether an employer-
employee relationship exists for purposes of the Fair Labor
Standards Act ("FLSA").  <u>See, e.g.</u>, <u>Herman v. RSR Sec. Servs.
Ltd.</u>, 172 F.3d 132 (2d Cir. 1999) (holding that chairman of the
board, who also owned 50% of company, was an "employer" under the
FLSA).  Harris's reliance on this line of cases is misplaced,
however.  In contrast to the FCA, which contains nothing to bring
individuals within the definition of "employer," the FLSA
explicitly defines "employer" as "any *person* acting directly or
indirectly in the interest of an employer in relation to an
employee[.]"  29 U.S.C. § 203 (emphasis added).

16

Persuaded by the overwhelming weight of authority against Harris's interpretation of the FCA, this Court holds that a supervisor is not an "employer" under Section 3730(h). Accordingly, Hutchins and Fletcher cannot be sued in their individual capacities, and their motion to dismiss must be granted with respect to the FCA claim.

**C.   Whether individual liability is available under Vermont common law**

Count Two also seeks damages on the ground that Defendants' termination of Harris "violated public policy under Vermont common law."  Hutchins and Fletcher argue that Vermont law does not provide for such an action against individual employees.

In Vermont, "under an at-will employment contract, an employee may be discharged at any time with or without cause, unless there is a clear and compelling public policy against the reason advanced for the discharge."  LoPresti v. Rutland Regional Health Servs., Inc., 177 Vt. 316, 325, 865 A.2d 1102, 1110 (2004).  "[W]hen an employer's course of conduct with regard to an at-will employee is cruel or shocking to the average [person's] conception of justice, such conduct must be considered contrary to public policy even if the policy is not explicitly set forth in [Vermont's] written laws."  Adams v. Green Mountain R.R., 177 Vt. 521, 523, 862 A.2d 233, 236 (2004).

Applying this standard, courts have permitted companies and other organizations to be sued for terminating employees in

violation of public policy.  See, e.g., LoPresti, 177 Vt. at 330-
31, 865 A.2d at 1114 (alleged retaliation for insisting on
adherence to professional ethics code); Payne v. Rozendaal, 147
Vt. 488, 494, 520 A.2d 586, 589 (1986) (alleged age
discrimination).  Harris does not point to any cases where such
actions have been permitted against supervisors or other
individuals, however, and there is case law in other
jurisdictions expressly foreclosing this.  See, e.g., Waters v.
Collins & Aikman Prods. Co., 208 F. Supp. 2d 593, 595 (W.D.N.C.
2002) ("North Carolina does not recognize a claim against a
supervisor in an individual capacity for wrongful discharge in
violation of public policy.").

     Harris argues that under Lyon v. Bennington College, 137 Vt.
135, 139, 400 A.2d 1010, 1013 (1979), corporate officers may be
sued in their individual capacity for tortious conduct.  As an
initial matter, Lyon involved a suit for tortious interference,
not wrongful or retaliatory discharge, and it is not clear that
Vermont courts would extend this doctrine to suits for discharge
in violation of public policy.  Even more importantly, however,
the holding in Lyon relied on the fact that the allegations were
"directed to actions taken in the defendants' individual
capacities, and not as any part of their corporate duties or
responsibilities."  Id.; see also Murray v. St. Michael's
College, 164 Vt. 205, 213, 667 A.2d 294, 300 (1995) ("[T]he tort

[of tortious interference] is applicable in limited situations against other employees or officers of the plaintiff's employer, the key factor being whether the defendants were acting outside the scope of their employment to further their own interests."). Here, Harris has made no allegation that Hutchins or Fletcher were acting outside of the scope of their employment when they terminated him.

Because Vermont case law provides no support for Harris's contention that he may bring an action for discharge in violation of public policy against Hutchins and Fletcher in their individual capacities, their motion to dismiss must be granted.

**D.   Whether Hutchins and Fletcher are entitled to attorneys' fees**

Hutchins and Fletcher argue that they should be awarded attorneys' fees on the ground that Harris's claims against them was frivolous.  The Court disagrees.  Although the Court cannot accept Harris's position that Hutchins and Fletcher can be sued in the circumstances presented here, Harris correctly points out that there is no binding Vermont or Second Circuit precedent that speaks directly to this issue.  For this reason, his claims are not so meritless as to warrant an award of attorneys' fees.

**CONCLUSION**

For the foregoing reasons, the arbitration motion is DENIED, and the Hutchins/Fletcher motion is GRANTED.

19

Dated at Burlington, Vermont this 16th day of May, 2006.


/s/ William K. Sessions III
William K. Sessions III
Chief Judge